44 A.3d 1134

**PENNSYLVANIA GAMING CONTROL BOARD, Petitioner**

v.

**OFFICE OF the ATTORNEY GENERAL OF the COMMONWEALTH of Pennsylvania, Respondent.**

Supreme Court of Pennsylvania.

Nov. 14, 2011.

## ORDER

PER CURIAM.

**AND NOW,** this 14th day of November, 2011, it is hereby ordered that the Petition for Review is denied.

The Application to File Under Seal is granted. The Motion to Strike Pennsylvania Gaming Control Board's Reply Brief or in the Alternative Permit OAG to File Sur–Reply Brief is denied.

Chief Justice CASTILLE files a Dissenting Statement.

Justice EAKIN Files a Dissenting Statement which is joined by Justice McCAFFERY.

Chief Justice CASTILLE, dissenting.

Because I do not believe that government agency officials should have to suffer incarceration as the price of securing judicial review of important and novel issues involving privilege under the circumstances presented here, I respectfully dissent from the Court's *per curiam* decision to deny the Petition for Review filed by the Pennsylvania Gaming Control Board ("Board"), which seeks review of the October 1, 2010 order arising from the Thirty–First Statewide Investigating

Grand Jury. I would grant the Petition for Review to address the question of whether the Commonwealth Attorneys Act, 71 P.S. § 732–208, authorizes the Office of the Attorney General ("OAG") to compel the production of documents in the possession of Commonwealth agencies without any limitation so as to foreclose the state agency from invoking the attorney-client and work-product privileges.

On May 15, 2009, the OAG issued a subpoena to the Board compelling production of certain documents related to investigations and reviews by the Board's Bureau of Investigations and Enforcement and/or the Office of Enforcement Counsel ("OEC") of applicants and applications for gaming licenses. The Board subsequently produced in excess of 2.3 million pages of documents in response to the subpoenas. The Board's Office of Chief Counsel and the Office of Enforcement Counsel initially withheld certain documents from production, however, asserting that those documents were subject to the attorney-client privilege or protected under the work-product doctrine.

On August 2, 2010, the OAG filed a Motion to Compel with the supervising judge of the grand jury, requesting that an order be entered compelling the production of the documents that the Board asserted were privileged. The OAG asserted that: (1) the attorney-client and work-product privileges do not operate to protect the documents and records of a Commonwealth agency from a subpoena issued by an investigating grand jury; (2) the OAG has broad statutory authority to access the books of the agencies and independent agencies of the Commonwealth pursuant to the Commonwealth Attorneys Act; and (3) the Board had waived the protections, if any, afforded by the attorney-client privilege and the work-product privilege.

In its response to the OAG's motion, the Board asserted the attorney-client privilege with respect to certain documents because the documents purportedly contained confidential communications between the Board and its attorneys in the Office of Chief Counsel for the purpose of securing either an opinion of law, legal services or assistance in a legal matter.

The Board asserted the work-product privilege with respect to other documents because the documents contained the opinions, theories or conclusions of attorneys employed by the Office of Chief Counsel.

Following a hearing, the supervising judge issued an Opinion and Order on October 1, 2010, granting the OAG's motion. The supervising judge recognized, however, that the issue of whether the Board as a Commonwealth agency may assert the attorney-client privilege when a subpoena has been issued as part of a grand jury investigation is a question of first impression in this Commonwealth. The Board filed its timely Petition for Review in this Court on October 12, 2010, and requested a stay from the supervising judge pending review by this Court. The stay was denied on October 22, 2010.

The Board then filed an application for stay of the supervising judge's order with this Court on October 29, 2010. On November 3, 2010, the OAG filed a motion with the supervising judge to hold the Board and its members and its executive director in contempt. A hearing was held on November 18, 2010, and the Board appeared before the supervising judge and informed him of its intention to comply with his order. The Board then filed a Motion for Leave to Withdraw Application for Stay of Order of the Supervising Judge, which was administratively granted by the Supreme Court Prothonotary's Office on November 19, 2010. The Board's compliance removed the necessity for this Court to act in an expedited fashion upon the Petition for Review, thereby opening the way for considered deliberation by this Court and precedential guidance, if the issues are deemed to warrant review.

The Board's Petition for Review from the supervising judge's order seeks review of the following issues:

(1) whether the supervising judge erred in holding that a Commonwealth agency may not assert any form of the attorney-client privilege in response to a subpoena from a statewide investigating grand jury;

(2) whether the supervising judge erred in holding that, even if the attorney-client privilege existed in this context, it

was effectively waived for the Board by the Pennsylvania Legislature;

(3) whether the supervising judge erred in concluding that the Pennsylvania Legislature and the OAG are the rightful "clients" and owners of the attorney-client privilege in this matter;

(4) whether the supervising judge erred in concluding that a Commonwealth agency may not assert any form of the work-product privilege in response to a statewide investigating grand jury subpoena; and

(5) whether the supervising judge erred in concluding that even if the work-product doctrine applied, the Board failed to show that the documents for which it asserted the work-product privilege were created in anticipation of litigation.

The Board asserts that the supervising judge's order is reviewable by this Court pursuant to the collateral order doctrine and Pa.R.A.P. 313. Under the collateral order doctrine, an order is immediately appealable if: (1) it is separable from and collateral to the main cause of action; (2) the right is too important to be denied review; and (3) the question presented is such that if review is postponed until final judgment in the case, the claimed right will be irreparably lost. Pa.R.A.P. 313(a); (b). We addressed the collateral order doctrine in the grand jury context in *In re Dauphin County Investigating Grand Jury*, 596 Pa. 378, 943 A.2d 929, 935 (2007), stating:

The collateral order doctrine authorizes an interlocutory appeal only from "an order separable and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." The collateral order doctrine is stringently applied. It is not sufficient that the claims are important to the parties; only claims that "involve rights deeply rooted in public policy going beyond the particular litigation at hand" warrant review. Additionally,

courts have declined to apply the collateral order doctrine and circumvent the typical path of challenging a subpoena. 943 A.2d at 935 (citations omitted).

The Board argues that the supervising judge's order was separable from and collateral to the main cause of action, as it relates only to the application of the attorney-client privilege and work-product privilege, and not to the ultimate grand jury issues of whether any Pennsylvania criminal statutes were violated in connection with the investigation of applicants for gaming licenses. The Board asserts that the rights involved are too important to be denied review. Finally, the Board asserts that the claimed right would be irreparably lost and would be effectively unreviewable on appeal from final judgment in any criminal case arising from the grand jury investigation. The Board claims that no matter what would occur in any criminal case resulting from the grand jury's investigation, it would forever lose its opportunity to challenge the OAG's asserted unfettered right to have access to privileged documents. Unlike any actual defendants who could be indicted, for the Board, there would be no trial, no sentence, and no subsequent right of appeal to vindicate its position.

The OAG responds that the order is interlocutory and not immediately appealable. The OAG relies upon the U.S. Supreme Court's recent decision in *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009).[1] The OAG also cites *In re Twenty–Fourth Statewide Investigating Grand Jury*, 589 Pa. 89, 907 A.2d 505 (2006), which stated:

As a general rule, an order denying a motion to quash a subpoena is considered interlocutory and not subject to immediate appeal. One seeking to challenge the propriety of a grand jury subpoena must generally choose between complying with the subpoena and litigating the validity

1. In *Commonwealth v. Harris*, J–65–2010, this Court is considering whether the *Mohawk* analysis should be adopted in Pennsylvania, or whether we should continue to recognize discovery orders that implicate privileged and confidential materials as appealable collateral orders under Pennsylvania Rule of Appellate Procedure 313.

through contempt proceedings. Requiring the choice between compliance with the subpoena and the possibility of contempt preserves the interest in expeditious grand jury proceedings. Further, the approach facilitates the development of an adequate factual record in support of the reasons for supporting resistance to the subpoena.

907 A.2d at 510. The OAG argues that if this Court does not adopt the *Mohawk* analysis, the order should not be deemed immediately appealable because (1) the documents are central to the grand jury investigation; (2) the attorney-client privilege and work-product privilege are not rights deeply rooted in the public policy of the Commonwealth; and (3) should the documents be disclosed in a presentment, the appellate courts can remedy the improper disclosure of privileged material by vacating an adverse judgment and remanding for a new trial in which the material would be excluded from evidence.

The OAG forwards a separate procedural argument, asserting that the Petition for Review should be dismissed as moot in light of the Board's decision to comply with the supervising judge's order after the OAG requested that the Board be held in contempt. The OAG acknowledges that this Court has recognized exceptions to the mootness doctrine, for example, "when the issue presented is one of great public importance or is one that is capable of repetition yet evading review." *Assoc. of Pa. State College v. Pa. Labor Relations Bd.*, 607 Pa. 461, 8 A.3d 300, 305 (2010) (citation omitted). The OAG asserts that no exception to the mootness doctrine exists here. In the OAG's view, the issues raised are not likely to evade review in the future because other Commonwealth agency litigants will have the same choice of either complying with a subpoena or challenging the validity of the subpoena through contempt proceedings. In this case, the Board elected to comply with the subpoena and its challenge to the validity of the subpoena in the OAG's opinion was rendered moot by that very election.

In its Reply, the Board responds that its decision to produce the documents did not alter its strongly-held belief that the documents were privileged. The Board determined, however,

that it had no option other than to turn over the documents after the OAG filed the contempt motion and requested that the Board's Executive Director and its members be incarcerated unless they purged themselves of the contempt.

On mootness, the Board argues that the issue of whether Commonwealth agencies can assert the protections of the attorney-client privilege and work-product privilege in response to a subpoena from a grand jury is one of great public importance. The Board argues that "[e]ven if the question is technically moot," the issue is reviewable because it is of great public importance and capable of repetition, but evading review. Reply at 4. The Board suggests that the supervising judge's ruling cloaks the OAG with almost unfettered power and alters the basic form of government by elevating the OAG to a position far superior to that of its fellow Commonwealth agencies. The Board claims that the OAG may now seek to subpoena government attorneys from the Office of the Governor and the General Assembly.

On the collateral order question, the Board reiterates that the order satisfied Pa.R.A.P. 313 and all three prongs of the collateral order test.

Presumably, this Court denies review based upon one or the other of the OAG's procedural arguments. In so doing, as to both arguments, the Court apparently accepts the OAG's view that the only appropriate way for the Board to secure review was to defy the subpoena and for its members and executive director to invite a finding of contempt and the potential sanction of incarceration. I recognize the support for that view in our prior cases via extrapolations of the holdings in our prior cases. But, I question whether the rationale for those restrictions should apply in this matter, where the subjects of the subpoena, who have been threatened with incarceration, are public employees of a public agency arguably just trying to do their jobs; they have complied with the subpoena, thus ensuring no delay in the grand jury proceedings; and they seek review of important privilege issues that could affect all governmental agencies.

This case is unusual in that the dispute ultimately is between the OAG in its own independent executive capacity, and another executive agency in its .capacity. Although the privilege issues are playing out with the Gaming Control Board, the dispute is not unique to that particular executive entity: indeed, any executive or governmental entity could be the subject of a grand jury investigation conducted by the OAG. Moreover, the privilege arguments forwarded by the Board are not designed to protect the private interests of its members or employees, or to delay the grand jury investigation—the Board's ultimate compliance proves as much—but are forwarded in an apparent good-faith effort by a public agency to ensure that it discharges its office with fidelity, as it understands that duty. The Board's arguments on the privilege merits may be appropriate or not. But, I believe that this circumstance, involving a public governmental entity and its employees seeking an answer to novel, important, and potentially recurring issues of privilege does not warrant resort to the Hobson's choice of "go to jail in contempt or forfeit the opportunity for any review." Indeed, I view the Board's compliance as an exceedingly reasonable recognition of, and accommodation of, the time pressures that attend the grand jury process, where appellate delays may impede the grand jury's ability to complete its task. I would not penalize the accommodation by denying review in this instance by the rote application of principles designed for less compelling circumstances, and thereby instruct public employees that they must go to jail in order to forward a good faith challenge of first impression in a matter such as this.

As noted, this Court has explained the "general rule" respecting the collateral order doctrine in grand jury matters—which requires that a person who would challenge the propriety of a grand jury subpoena must "choose between complying . . . and litigating the validity through contempt proceedings"—by noting that the rule "preserves the interest in expeditious grand jury proceedings" and "facilitates the development of an adequate factual record." *In re Twenty–Fourth Statewide Investigating Grand Jury,* 589 Pa. 89, 907 A.2d 505,

510 (2006). Neither of those rationales is supported by the denial of collateral order review status here. The Board's compliance has assured that its challenge did not delay the proceedings of the grand jury; and there is no suggestion that the record is inadequate to decide the purely legal privilege questions presented.[2] Moreover, to the extent that review here could be said to "circumvent the typical path of challenging a subpoena," *In re Dauphin County Fourth Investigating Grand Jury*, 596 Pa. 378, 943 A.2d 929, 935 (2007), for the reasons I have already expressed, I do not believe that the Hobson's choice is appropriate here, and the overarching issue is of great importance and capable of evading review.

Even aside from these concerns, the OAG's mootness argument is not well taken. The Board's compliance with the subpoena, rather than subjecting Board members and its executive director to contempt proceedings and coercive imprisonment, has not rendered the issues raised by the Board moot. Subsequent to the filing of the underlying petition, the Thirty–First Statewide Investigating Grand Jury issued "Grand Jury Report No. 1" ("Report") on May 19, 2011, addressing its "investigation of possible violations of law by individuals during the establishment of the Pennsylvania Gaming Control Board and the issuance of gaming licenses by that entity from approximately July 5, 2005 through the present." The Report stated that the "investigation originated as a result of information received, in part, from former legislators, staff of former legislators, and employees of the Pennsylvania

---

**2.** The status of the persons subject to the threat of contempt here, and the Board's compliance while concomitantly seeking review, distinguishes cases where this Court has rejected collateral order doctrine arguments involving grand jury proceedings in which the disclosures of documents were claimed to be privileged. *See In re Twenty–Fifth Statewide Investigating Grand Jury,* 137 MM 2007 (*per curiam* order denying application for King's Bench powers and extraordinary jurisdiction filed by Pennsylvania House Democratic Caucus challenging release of documents claimed to be privileged under the Speech and Debate clause); *In re Twenty–Fourth Statewide Investigating Grand Jury,* 589 Pa. 89, 907 A.2d 505 (2006) (rejecting newspaper's invocation of collateral order doctrine for immediate review of its challenge to grand jury subpoena requiring production of computer hardware as violative of First Amendment).

Gaming Board." Report at 5. The issues raised in the under-lying Petition arose from that investigation.

The supervising judge issued an order accepting and filing the Report on May 19, 2001. The supervising judge directed that the OAG deliver copies of the report to the following entities: (1) both Houses and all four caucuses of the Pennsylvania Legislature, (2) the Governor, (3) the Supreme Court of Pennsylvania, (4) the Disciplinary Board of the Supreme Court, (5) the Department of the Auditor General, (6) the Gaming Control Board, (7) the Department of Revenue, and (8) any future investigating grand juries empaneled by the OAG. The Report proposed "recommendations for executive and administrative action in the public interest."

The OAG's public issuance of the Report and the absence of any indictments reflect that the issues raised by the Board not only are capable of evading review, but in fact they have evaded review. This Court has direct review responsibility in matters affecting grand juries; and only this Court can establish a general rule addressing the privilege issues. The rule would be of broad application beyond this particular matter, providing guidance to the OAG and to every governmental agency. In the absence of any definitive statement by this Court as to whether the government attorney-client privilege and work-product privilege apply in the context of a statewide investigating grand jury, there is an unacceptable uncertainty cast over communications between government lawyers and the agencies whom they represent. The appeal obviously qualifies as an exception to mootness.

The remaining question is whether the issues are important enough to warrant collateral order review. I believe they are. The OAG relies primarily upon the Commonwealth Attorneys Act as support for its position that a Commonwealth agency may not invoke the attorney-client privilege or the work-product privilege. I would grant the Board's Petition for Review to address the substantive issues of first impression regarding the proper interpretation of the Commonwealth Attorneys Act and the interplay of that Act and the protections afforded by the attorney-client privilege and the work-

product privilege. The issues are ones of great public importance involving the interplay of those protections and the Commonwealth Attorneys Act in the context of a statewide investigating grand jury. Indeed, this issue involves the very foundational relationship between governmental agencies.

Pursuant to the Commonwealth Attorneys Act, the Attorney General has "the right to access at all times to the books and papers of any Commonwealth agency necessary to carry out his duties under this Act." 71 P.S. § 732–208. Notably, the statute itself does not convey unqualified power, nor does it speak to grand juries. In addition, the provision does not specifically preclude a Commonwealth agency from invoking the attorney-client privilege or the work-product privilege in the context of a grand jury investigation. The question of whether the statute's silence on the invocation of such protections should be interpreted as prohibiting the same is an issue of great public importance that should be addressed by this Court.

It should be noted that the OAG's interpretation of the statute does not account for the fact that the Commonwealth Attorneys Act encompasses more than the OAG's function as the chief law enforcement of the Commonwealth. Specifically, the statute also refers to the OAG's function as a member of specific agencies, stating as follows:

> The Attorney General shall serve as a member of the Board of Pardons and he, or his designated deputy, shall serve as a member of the Joint Committee on Documents, the Hazardous Substances Transportation Board, the Board of Finance and Revenue, the Pennsylvania Commission on Crime and Delinquency, the Pennsylvania Emergency Management Agency, the Civil Disorder Commission and the Municipal Police Officers Education and Training Commission.

71 P.S. § 732–207. Whether the provision of the Commonwealth Attorneys Act granting the OAG the right of access to the books and papers of any Commonwealth agency necessary to carry out its duties thereunder was intended to facilitate the performance of the OAG's duties, rather than to eliminate the protections ordinarily afforded by the attorney-client privi-

lege and the work-product privilege, is an issue that warrants consideration by this Court.

Notably, this uncertainty exists as well in the context of federal grand jury proceedings, as there is a split of authority among the United States Courts of Appeals on the issue of whether a government attorney-client privilege exists in the context of a federal grand jury investigation. The division of authority has been left unresolved by the U.S. Supreme Court.

The Seventh Circuit Court of Appeals addressed the issue relating to the attorney-client privilege in *In re: A Witness Before the Special Grand Jury 2000–2*, 288 F.3d 289 (7th Cir.2002). That court affirmed the district court's determination that no government attorney-client privilege existed in the context of a federal criminal investigation.

The underlying federal investigation in that case involved the improper issuance of commercial drivers' licenses, specialty license plates, and leases; the improper use of campaign funds; and obstruction of justice in connection with internal office investigations. Federal prosecutors served a grand jury subpoena on Robert Bickel, the Chief Legal Counsel to the former Illinois Secretary of State George Ryan, to compel Bickel to testify about conversations that he had with Ryan in his capacity as counsel. Bickel indicated that he would not waive any attorney-client privilege with respect to those conversations, and the federal prosecutors filed a motion to compel him to testify.

The district court granted the motion to compel, determining that no attorney-client privilege attached to the communications. As the Seventh Circuit Court of Appeals permits a client to immediately appeal a court order compelling his attorney to appear and testify before a grand jury, the issue of whether Ryan could invoke the attorney-client privilege to shield Bickel's testimony before the federal grand jury was addressed on direct appeal.

The Circuit Court considered the argument that the attorney-client privilege was created to encourage full and frank communications between attorneys and their clients, and that

such unhindered communications would be impeded if government officials avoided candid discussions of legal matters because the conversations with their attorneys were not protected by the privilege. The court discussed the attorney-client privilege, stating:

One of the oldest and most widely recognized privileges is the attorney-client privilege, which protects confidential communications made between clients and their attorneys for the purpose of securing legal advice. It is well established that a client may be either an individual or a corporation. But here, we have a special case: the client is neither a private individual nor a private corporation. It is instead the State of Illinois itself, represented through one of its agencies. There is surprisingly little case law on whether a government agency may also be a client for purposes of this privilege, but both parties here concede that, at least in the civil and regulatory context, the government is entitled to the same attorney-client privilege as any other client. We therefore proceed on that basis.

288 F.3d at 291 (citations omitted).

The Office of the U.S. Attorney asserted that the privilege between a government attorney and his client did not extend to criminal proceedings, such as a federal grand jury investigation. The court agreed that the recognition of a government attorney-client privilege in the civil context did not compel recognition of such a privilege in the criminal context. The court concluded that "the policy reasons behind the attorney-client privilege do not justify its extension to government attorneys in the context of criminal investigations...." 288 F.3d at 295.

The court further stated:

While we recognize the need for full and frank communication between government officials, we are more persuaded by the serious arguments against extending the attorney-client privilege to protect communications between government lawyers and the public officials they serve when criminal proceedings are at issue. First, government law-

yers have responsibilities and obligations different from those facing members of the private bar. While the latter are appropriately concerned first and foremost with protecting their clients—even those engaged in wrongdoing—from criminal charges and public exposure, government lawyers have a higher, competing duty to act in the public interest. They take an oath, separate from their bar oath, to uphold the United States Constitution and the laws of this nation (and usually the laws of the state they serve when, as was the case with Bickel, they are state employees). Their compensation comes not from a client whose interests they are sworn to protect from the power of the state, but from the state itself and the public fisc. It would be both unseemly and a misuse of public assets to permit a public official to use a taxpayer-provided attorney to conceal from the taxpayers themselves otherwise admissible evidence of financial wrongdoing, official misconduct, or abuse of power. Therefore, when another government lawyer requires information as part of a criminal investigation, the public lawyer is obligated not to protect his governmental client but to ensure its compliance with the law.

288 F.3d at 293 (citations and footnote omitted). The court concluded that "the lack of criminal liability for government agencies and the duty of public lawyers to uphold the law and foster an open and accountable government outweigh any need for a privilege in this context." *Id.* at 294. *See also In re Lindsey,* 158 F.3d 1263 (D.C.Cir.1998), *cert. denied,* 525 U.S. 996, 119 S.Ct. 466, 142 L.Ed.2d 418 (1998) (attorney-client privilege could not be invoked by Deputy White House counsel); *In re Grand Jury Subpoena Duces Tecum,* 112 F.3d 910 (8th Cir.1997), *cert. denied,* 521 U.S. 1105, 117 S.Ct. 2482, 138 L.Ed.2d 991 (1997) (neither attorney-client privilege nor work product doctrine may be invoked to avoid compliance with independent prosecutor's issuance of subpoena to President and First Lady to compel production of documents relating to "Whitewater" investigation).

When confronted with the same issue in *In re: Grand Jury Investigation,* 399 F.3d 527 (2nd Cir.2005), the Second Circuit

Court of Appeals addressed the policy concerns analyzed by the Seventh Circuit Court of Appeals, but arrived at the opposite conclusion. In that case, a federal grand jury subpoenaed Anne George, former chief legal counsel to the Office of the Governor of Connecticut, during an investigation into whether then-Governor Rowland and his staff members had received gifts from private individuals and entities in return for favorable negotiations and awarding of state contracts. A motion to compel the testimony was filed with the district court after George declined to testify. After the district court entered an order compelling the testimony, the Office of the Governor and George appealed.

On appeal, the Office of the U.S. Attorney asserted that the reasons for the traditional attorney-client privilege did not apply with the same force to a federal grand jury investigation into potentially criminal government conduct. The U.S. Attorney also argued that the government attorney has a fundamentally different relationship with the client than does a private attorney representing a private individual. The U.S. Attorney asserted that the privilege should not be used as a shield to permit a government attorney to withhold client confidences, when revealing them would be in the public interest.

The Court of Appeals observed that "[i]mplicit in the Government's argument is the presumption that the public interest in the present circumstances lies with disclosure and the furtherance of the 'truth-seeking' function of the grand jury." 399 F.3d at 534. The court was not persuaded by this argument, however, stating:

> We cannot accept the Government's unequivocal assumption as to where the public interest lies. To be sure, it is in the public interest for the grand jury to collect all the relevant evidence it can. However, it is also in the public interest for high state officials to receive and act upon the best possible legal advice. Indeed, the people of Connecticut have deemed the latter interest more important than the former: if *state* prosecutors had sought to compel George to reveal the conversations at issue, there is little doubt that the

conversations would be protected. The Connecticut legislature has enacted a statute specifically providing that

> [i]n any civil or criminal case or proceeding or in any legislative or administrative proceeding, all confidential communications shall be privileged and a government attorney shall not disclose any such communications unless an authorized representative of the public agency consents to waive such privilege and allow such disclosure.

Conn. Gen.Stat. § 52–146r(b).[3] The people of Connecticut, then, acting through their representatives, have concluded that the public interest is advanced by upholding a governmental privilege even in the face of a criminal investigation. We do not suggest, of course, that federal courts, charged with formulating federal common law, must necessarily defer to state statutes in determining whether the public welfare weighs in favor of recognizing or dissolving the attorney-client privilege. But we cite the Connecticut statute to point out that the public interest is not nearly as obvious as the Government suggests. One could as easily conclude, with the Connecticut legislature, that the protections afforded by the privilege ultimately promote the public interest, even when they might impede the search for truth in a particular criminal investigation.

We believe that, if anything, the traditional rationale for the privilege applies with special force in the government context. It is crucial that government officials, who are expected to uphold and execute the law and who may face criminal prosecution for failing to do so, be encouraged to seek out and receive fully informed legal advice. Upholding the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and

---

**3.** The Pennsylvania General Assembly has enacted a statute relating to confidential communications to an attorney, which provides that "[i]n a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S. § 5916.

even indispensable part of conducting public business. Abrogating the privilege undermines that culture and thereby impairs the public interest.

399 F.3d at 534 (emphasis supplied).

The court concluded that the attorney-client privilege should not be abrogated as the privilege fosters the free flow of information between government officials and counsel. The court perceived that unimpeded communication would enable government officials to better discharge their duties to their offices. The court noted that its decision was in conflict with the Seventh Circuit Court of Appeals, and in tension with decisions of the Eighth Circuit and the District of Columbia Circuit, but observed that it was in no position to resolve that tension in the law.

The existence of the developed reasoning on both sides of this issue shows the difficulty of the issue. Unlike the Circuit Courts, however, this Court is in the position of definitively resolving any tension in the law as it applies to Pennsylvania statewide grand jury proceedings. By denying the Board's Petition for Review without explanation, we have interjected uncertainty into the grand jury process when state agencies are involved. Given the uncertainty as to the applicability of the attorney-client privilege and the work-product privilege in the context of statewide grand jury proceedings involving government agencies, this Court should address the issues so that government officials are fully informed of the ramifications of seeking legal advice from government lawyers in the course of their duties. Government officials should not be placed in the untenable position of suffering contempt hearings and potential incarceration in order to get this Court to do its job.

With these important issues dismissed and left unresolved, I suppose government officials will have to consider whether to engage privately retained attorneys to advise them in the performance of their official duties. Government officials who may have presumed that their communications with government lawyers are protected by the attorney-client privilege

cannot at this juncture rely upon the protections afforded to clients of private attorneys.

Furthermore, the statutory interpretation of the Commonwealth Attorneys Act, 71 P.S. § 732–208, that has been proffered by the OAG as support for an implied abrogation of the attorney-client privilege and the work-product privilege has not been scrutinized by this Court. The OAG proceeded to obtain testimony and documents based upon its own statutory interpretation during the course of conducting a statewide grand jury investigation. Whether or not the statute supports the interpretation asserted by the OAG, but for this Dissenting Statement, the secrecy of the grand jury process would preclude other government officials and government lawyers from even learning that traditional privileges have been construed by the OAG as not applying to that office, among other offices, based upon the Commonwealth Attorneys Act. Nor would the General Assembly have knowledge of the OAG's interpretation, should clarification of the statute, or adjustment of the powers of the OAG, be deemed necessary. And, these officials may well be surprised to learn of the OAG's fixed position that the price of securing judicial review, for employees of governmental agencies, is incarceration.

I offer no view on the merits, but I respectfully dissent from the decision not to exercise review. I would grant the Board's Petition for Review to consider the ripe, important legal issues presented therein.

Justice EAKIN files a Dissenting Statement which is joined by Justice McCAFFERY.

Justice EAKIN, dissenting.

I would grant the Petition for Review.

Justice McCAFFERY joins the Dissenting Statement.